1   GRACE Y. PARK (SBN 239928)
2   gpark@cpmlegal.com
    **COTCHETT, PITRE & McCARTHY, LLP**
3   San Francisco Airport Office Center
4   840 Malcolm Road
    Burlingame, CA 94010
5   Telephone: (650) 697-6000
6   Facsimile: (650) 697-0577

7   CARLOS URZUA (SBN 303176)
8   curzua@cpmlegal.com
    **COTCHETT, PITRE & McCARTHY, LLP**
9   2716 Ocean Park Blvd., Suite 3088
10  Santa Monica, California 90405
    Telephone: (310) 392-2008
11  Facsimile: (310) 392-0111

12
    *Attorneys for Relator*
13

14              IN THE UNITED STATES DISTRICT COURT

15          FOR THE CENTRAL DISTRICT OF CALIFORNIA

16

17  UNITED STATES OF AMERICA AND        CASE NO. 2:20-cv-08439-WLH-PVC
    THE STATE OF CALIFORNIA *ex rel.*
18  Oak Bull, LLC, a New Mexico, LLC    *Assigned for all purposes to Hon.*
                                        *Wesley L. Hsu*
19
            Plaintiffs,
20                                      *QUI TAM* PLAINTIFF'S FIRST
                                        AMENDED COMPLAINT FOR
21          v.                          VIOLATIONS OF THE FEDERAL
                                        FALSE CLAIMS ACT AND
22  CEDARS-SINAI MEDICAL CENTER;        CALIFORNIA INSURANCE FRAUDS
    HYUN BAE, M.D.; JASON M.            PREVENTION ACT
23  CUELLAR, M.D.; RICK
    DELAMARTER, M.D.; MICHAEL
24  KROPF, M.D.; TODD H. LANMAN,
    M.D.; ALEXANDRE RASOULI, M.D.       <u>DEMAND FOR JURY TRIAL</u>
25
26
            Defendants.
27

28

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

# TABLE OF CONTENTS

Page No(s).

I.     INTRODUCTION ................................................................................ 1

II.    JURISDICTION AND VENUE ......................................................... 3

III.   PARTIES ............................................................................................ 3

       A.    Plaintiffs and Relator ............................................................. 3
       B.    Defendants .............................................................................. 4

IV.    STATUTORY AND REGULATORY FRAMEWORK ................... 5

       A.    The False Claims Act and California Insurance
             Frauds Prevention Act ........................................................... 5
       B.    Government Healthcare Provisions ....................................... 6
       C.    Private Insurer Guidelines .................................................. 14

V.     FACTUAL ALLEGATIONS ........................................................... 16

       A.    Exposing Defendants' Fraud and Deception ....................... 16
       B.    *Scheme 1*: Concurrent Surgeries ....................................... 17
       C.    *Scheme 2*: Falsified Operative Reports in
             Artificial Disk Replacement Surgeries ............................... 34

VI.    CAUSES OF ACTION .................................................................... 42

       FIRST CAUSE OF ACTION ......................................................... 42

       SECOND CAUSE OF ACTION ..................................................... 43

       THIRD CAUSE OF ACTION ......................................................... 44

       FOURTH CAUSE OF ACTION ..................................................... 44

       FIFTH CAUSE OF ACTION .......................................................... 46

VII.   PRAYER FOR RELIEF .................................................................. 47

VIII.  JURY DEMAND ............................................................................. 49

## I.    **INTRODUCTION**

1.    From at least 2009 to the present, Cedars-Sinai Medical Center in conspiracy with orthopedic surgeons, Hyun Bae, M.D., Jason M. Cuellar, M.D., Rick Delamarter, M.D., Michael Kropf, M.D., Todd H. Lanman, M.D., and Alexandre Rasouli, M.D. (collectively, "Defendants"), caused the submission of false claims for reimbursement to government and private payers, in violation of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*., and the California Insurance Fraud Prevention Act ("CIFPA"), Cal. Ins. Code § 1871.7.

2.    Defendants used their status as the leading academic healthcare organization in California to take advantage of patient trust for their own financial benefit by implementing the following schemes detailed below.

3.    *Scheme 1: Concurrent Surgeries.*  From at least April 2009 to the present, Defendants Rick Delamarter, M.D., Hyun Bae, M.D., and Alexandre Rasouli, M.D. conspired to schedule and perform two, sometimes three, simultaneous surgeries without patient knowledge or informed consent, to maximize financial reimbursement.    In submitting claims for surgeries concurrently performed, Delamarter, Bae, and Rasouli falsely certified to the Center for Medicare & Medicaid Services ("CMS") their role as the primary surgeon during "critical part[s] of [the] surgery" and that they fulfilled their surgical duties under proper patient consent. Intra-Operative Nursing Reports show that instead, Delamarter, Bae, and/or Rasouli performed critical surgical operations in multiple operating rooms simultaneously on non-consenting patients.    As a result, Cedars-Sinai, Delamarter, Bae, and Rasouli received tens of millions of dollars from CMS for false claims submitted for concurrent surgical procedures supported with false and inadequate records.    Each claim submitted to CMS by Cedars-Sinai, Delamarter, Bae, and Rasouli for concurrent surgeries with invalid consent is a violation of the FCA.

4.    *Scheme 2: Artificial Disk Replacement Surgeries and Falsified Operative Reports.*  From at least June 2014 to the present, Defendants Todd H. Lanman, M.D.,

Jason M. Cuellar, M.D., and Michael Kropf, M.D. performed Artificial Disk Replacement ("ADR") surgeries outside private insurer and CMS guidelines. Private insurers and CMS limit the number of "levels" a surgeon shall perform in specifically codified guidelines. This is because multi-level ADR surgeries are still considered experimental and investigational, and not subject to reimbursement. To skirt these restrictions, Lanman, Cuellar, and Kropf falsified operative reports to reflect that ADR surgeries were performed within pertinent guidelines to maximize reimbursement. Corresponding x-ray imaging in these cases reveals that multi-level surgeries were performed on patients against CMS and private insurer guidelines. Cedars-Sinai, Lanman, Cuellar, and Kropf submitted false claims for multi-level ADR surgeries to both private insurers (including but not limited to Blue Cross and Cigna) and traditional Medicare and Medicare Advantage Organizations ("MAOs") resulting in tens of millions of dollars in reimbursement for experimental ADR surgeries. Each submission for payment to private insurers and CMS by Cedars-Sinai, Lanman, Cuellar, and Kropf with the use of a fraudulent operative report is a violation of the FCA and CIFPA.

5.     Between 2009 and 2015, Relator informed Cedars-Sinai Medical Center executives and senior staff, including but not limited to Bruce Gewertz, M.D. (Professor of Surgery and Surgeon in Chief), Theodore Goldstein, M.D. (Medical Director of Cedars-Sinai Spine Center), William Brien, M.D. (Clinical Professor of Surgery and Executive Vice Chairman, Department of Surgery), Bryan Croft (Executive Vice President and Chief Operating Officer) and Thomas M. Priselac (Chief Executive Officer) of ongoing federal and state violations exhibited in the above referenced schemes. In response, Cedars-Sinai and its leadership ignored Relator's concerns and continued to benefit financially from Defendants' schemes.

6.     In addition to receiving millions of dollars in reimbursement funds for the submission of false claims to insurers, Defendants' conduct ultimately led to multiple incidences of irreversible patient harm, permanent pain, and revisional

surgeries.

7.    These derelictions disregard standards established as a condition of payment by CMS and the State of California.

## II.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3730(b), which confers jurisdiction on the court for actions brought under the federal False Claims Act.  The court additionally has subject matter jurisdiction over the False Claims Act claims (first to third causes of action) pursuant to 28 U.S.C. § 1331.

9.    Additionally, this Court has supplemental jurisdiction over the other claims in this action pursuant to 28 U.S.C. § 1367, as they are so related to the FCA claims in the action that they form part of the same case or controversy.

10.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and 28 U.S.C. § 1391(b)-(c) because Defendants can be found in, reside in, or transact business in, the Central District of California, and the alleged acts occurred in this District.

## III.    PARTIES

### A. Plaintiffs and Relator

11.    **United States of America and the State of California**.  Plaintiffs in this action are the United States of America and the State of California, by and through Relator Oak Bull, LLC, a New Mexico LLC.

12.    **Relator Oak Bull, LLC, a New Mexico LLC**.  Relator Oak Bull, LLC, a New Mexico LLC was formed by Hooman Melamed, M.D. FAAOS ("Relator" or "Dr. Melamed").  Dr. Melamed is an Orthopedic Spine Surgeon & Orthopedic & Sports Medicine Specialist with 19 years of experience.  Relator has direct and independent knowledge of non-public information on which these allegations are based.  The facts alleged in this First Amended Complaint are based entirely upon Relator's personal observation and investigation, as well as documents in his possession.  Prior to the filing of this action, Relator provided the information in this

First Amended Complaint to the United States of America and the State of California.

### B. Defendants

13. **Cedars-Sinai Medical Center ("Cedars-Sinai")**.  Relator is informed and believes and thereupon alleges that at all times relevant to the allegations in this First Amended Complaint, Cedars-Sinai, was and now is a corporation organized and existing under and by virtue of the laws of the State of California, that said Defendant was and is authorized to do and is doing business in the State of California, and has regularly conducted business in the State of California.  At all relevant times, Cedars-Sinai is one of the largest nonprofit academic medical centers in the United States.

14. Relator is informed and believes and thereupon alleges that at all times relevant to the allegations in this First Amended Complaint, Cedars-Sinai executives and employees, including but not limited to Theodore Goldstein, M.D. (Medical Director of Cedars-Sinai Spine Center), William Brien, M.D. (Clinical Professor of Surgery and Executive Vice Chairman, Department of Surgery), Bruce Gewertz, M.D. (Professor of Surgery and Surgeon in Chief), Bryan Croft (Executive Vice President and Chief Operating Officer) and Thomas M. Priselac (Chief Executive Officer) recklessly or knowingly authorized Schemes 1 and 2 on Defendant Cedars-Sinai's behalf.

15. **Hyun Bae, M.D. ("Bae")**.  Relator is informed and believes and thereupon alleges that from April of 2009 to the present, Bae was and now is an orthopedic spine surgeon, an employee, agent and/or independent contractor of Cedars-Sinai, Professor of Orthopedics and Surgery at Cedars-Sinai, Co-Medical Director of Spine Education at Cedars-Sinai, and was and now is a resident of the County of Los Angeles, State of California.

16. **Jason M. Cuellar, M.D. ("Cuellar")**.  Relator is informed and believes and thereupon alleges that from August of 2015 to the present, Cuellar was and now is an orthopedic spine surgeon, an employee, agent and/or independent contractor of Cedars-Sinai, Assistant Professor of Orthopedics at Cedars-Sinai, and was and now is

a resident of the County of Los Angeles, State of California.

17. **Rick Delamarter, M.D. ("Delamarter")**.  Relator is informed and believes and thereupon alleges that from April 2009 until he retired in May 2013, Delamarter was an orthopedic spine surgeon, an employee, agent and/or independent contractor of Cedars-Sinai, Co-Director of the Cedars-Sinai Spine Center,  Vice Chair of Spine Services in Cedars-Sinai's Department of Surgery, and was and now is a resident of the County of Los Angeles, State of California.

18. **Michael Kropf, M.D. ("Kropf")**.  Relator is informed and believes and thereupon alleges that from August of 2015 to the present, Kropf was and now is an orthopedic spine surgeon, an employee, agent and/or independent contractor of Cedars-Sinai, and was and now is a resident of the County of Los Angeles, State of California.

19. **Todd H. Lanman, M.D. ("Lanman")**.  Relator is informed and believes and thereupon alleges that from June of 2014 to the present, Lanman was and now is an orthopedic spine surgeon, an employee, agent and/or independent contractor of Cedars-Sinai, and was and now is a resident of the County of Los Angeles, State of California.

20. **Alexandre Rasouli, M.D. ("Rasouli")**.  Relator is informed and believes and thereupon alleges that from June of 2014 to the present, Rasouli was and now is an orthopedic spine surgeon, an employee, agent and/or independent contractor of Cedars-Sinai, and was and now is a resident of the County of Los Angeles, State of California.

## IV. STATUTORY AND REGULATORY FRAMEWORK

### A. The False Claims Act and California Insurance Frauds Prevention Act

21. The federal False Claims Act, 31 U.S.C. § 3729, *et seq*. provides that any person: (a) who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("presentment claim"); (b) knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent

claim ("make or use claim"); (c) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the United States ("reverse FCA claim"), or (d) conspires to commit a presentment, make or use, or reverse FCA claim ("conspiracy claim") is liable for a civil penalty per claim plus three times the amount of damages the United States sustained. *See* 31 U.S.C. §§ 3729(a)(1)(A)-(C), and (G).

22.    The California Insurance Frauds Prevention Act provides materially identical provisions to the FCA. *Compare* Cal. Ins. Code § 1871.7 *et seq*. *with* 31 U.S.C. §§ 3729(a)(1)(A)-(C), and (G).

**B. Government Healthcare Provisions**

23.    *Medicare*.  The Medicare Program is a federal health insurance program that pays for covered medical care provided to eligible aged and disabled persons. *See* 42 U.S.C. § 1395, *et seq*.

24.    Three of the four major parts of Medicare are at issue in this action: Medicare Part A covers the cost of inpatient hospital services; Medicare Part B covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician or, in the case of teaching hospitals, supervised by a physician where strict requirements are satisfied; and Medicare Part C through private health insurers, called Medicare Advantage Organizations.

25.    Hospitals receive payment for inpatient hospital admissions using the diagnosis-related group ("DRG") system, which classifies hospital cases into one of approximately 500 groups, which are expected to have similar hospital resource use. Hospitals are generally paid a prospective bundled rate for each specific DRG, since patients within each category are considered similar clinically and are expected to use the same level of hospital resources.

26.     As a teaching hospital, engaged in the training of medical students, residents, and fellows ("trainees"), Cedars-Sinai is eligible to be reimbursed for the teaching activities of clinical faculty physicians ("teaching physicians").  Teaching hospitals may also properly bill under Medicare Part B for medical services of attending physicians in limited circumstances where the attending physician is directly involved in providing patient services.  Resident salaries are included among the costs for which hospitals are reimbursed under Part A; thus, services provided by residents typically cannot be billed under Medicare Part B.

27.     When physicians provide patient care services in a hospital setting, whether to hospital inpatients or outpatients, they (or an entity to which they have assigned billing rights) may bill Medicare for their "professional" services, which include performing procedures and interpreting test results, using a CMS Form 1500. The hospital may submit a separate claim to Medicare for the "technical" or "facility" component of the services rendered, as described in the preceding paragraph, under which the hospital is reimbursed for furnishing, among other things, equipment and non-physician staff.

28.     Providers must be enrolled in Medicare in order to be reimbursed under Medicare Part A or B. *See* 42 C.F.R. § 424.505.  To enroll in Medicare, institutional providers such as hospitals periodically must complete a Medicare Enrollment Application (often called a Form CMS-855A).  In completing the Medicare Enrollment Application, an institutional provider certifies:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicare.

29. As part of the above certification in the Medicare Enrollment Application, the physician and hospital further agree to: "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and to "not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

30. Medicare enrollment regulations further require providers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

31. Medicare only pays for services that are *reasonable and necessary* for the diagnosis or treatment of illness or injury to improve the functioning of a malformed body member. 42 U.S.C. §1395y(a)(1)(A). (*Emphasis added*).

32. Additionally, the failure to document appropriately work during surgery is a condition of payment. 42 C.F.R. § 415.172(b).

33. *Outpatient Hospital Admission*. Under Medicare Part B, a physician may submit claims for reimbursement using either a hard copy or electronic CMS 1500 form. In doing so, the physician must certify that he/she has knowledge of Medicare's requirements, and that the individual claim complies with applicable laws and regulations.

34. *Medicare Advantage Organizations*. Part C is the Medicare Advantage Program, which provides Medicare benefits to certain Medicare beneficiaries through private health insurers, called Medicare Advantage Organizations ("MAO"), *see* 42 U.S.C. § 1395w-21, *et seq*. Under Medicare Part C, the Government pays each MAO a fixed monthly payment for each Medicare beneficiary enrolled in the MAO's plan. The Government adjusts these payments for various risk factors that affect expected healthcare expenditures, including the health status of each enrollee. The adjustments are intended to ensure that MAOs are paid more for those enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur lower costs.

35. To obtain payments based on adjustment for health status, MAOs submit

diagnosis codes to the Government for the beneficiaries in their Medicare Advantage plans. These diagnosis codes are based on the beneficiaries' medical encounters (e.g., office visits, surgical procedures, and hospital stays). Using these diagnosis codes, the Government creates a risk score for each beneficiary. The beneficiary's risk score is then used to calculate monthly payments to the MAOs for that beneficiary for the following year. In general, the more numerous and severe the beneficiary's conditions, the higher his/her risk score will be, and the greater the risk-adjusted payments to the MAO will be during the next year.

36. _Graduate Medical Education Program_. Cedars-Sinai is a teaching hospital within the meaning of 42 C.F.R. § 415.152. As such, Cedars-Sinai receives direct and indirect graduate medical education ("GME") funds under Medicare Part A to subsidize the cost of its medical residency program, including payments for resident salaries and to cover the cost of the training that teaching physicians provide to residents, and must abide by additional conditions of payment to receive reimbursement from Medicare.

37. The GME funds received from federal sources for graduate medical education are significant. In 2010, for example, Medicare contributed $9.5 billion to teaching hospitals in the United States to support the training of about 100,000 residents. (_The Uncertain Future of Medicare and Graduate Medical Education_, Ingelhart, John K., New Eng. J. of Med., 365; 14, p. 1340 (2011)). In addition, Cedars-Sinai receives funding to cover the cost of salaries and other overhead associated with resident training.

38. Cedars-Sinai may only bill Medicare Part B for the services (such as surgeries) rendered by teaching physicians on its faculty incident to the instruction of residents when all Medicare rules and regulations are followed.

39. A teaching physician is defined as a physician, other than a resident, who involves residents in the care of his or her patients. _See_ 42 C.F.R. § 415.152; CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, §100. A

resident is an individual who participates in an approved graduate medical education program. *Id*.

40.    To receive additional payment from a Government Health Benefit Program for physician services rendered in a surgical procedure performed at a teaching hospital, the claimant must certify that the procedure met certain criteria that are expressly labeled as "conditions of payment." 42 C.F.R. § 415.170. Those conditions include that the services: (a) are personally furnished by a physician who is not a resident; or (b) are furnished by a resident in the presence of a teaching physician. *Id*.

41.    If a resident participates in the surgical procedure, the teaching physician may only submit a physician service claim to Medicare if the teaching physician was physically present for the "key portions" or "critical portions" of the surgical procedure. 42 C.F.R. § 415.172(a)(1); CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, § 100.1 (Payment for Physician Services in Teaching Settings).

42.    In addition, in the case of surgery or other complex procedures – such as the procedures performed by the orthopedic surgeons that are at issue in this First Amended Complaint – the teaching physician must be present for all "critical portions" of the procedure and "immediately available" during the entire service or procedure. 42 C.F.R. § 415.172(a)(1); CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, § 100.1.2 (Surgical Procedures).

43.    These requirements are central to the Government's bargain with teaching hospitals, and are not minor and insubstantial, as they help ensure that residents' work is adequately supervised, and that patients receive appropriate care.

44.    CMS defines "critical portion" to be the portion of the procedure the teaching physician determines to be critical. CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, § 100 (Teaching Physician Services, Definitions).

45.   In addition, the teaching physician "must personally document in the medical record that he/she was physically present during the critical or key portion(s)" of the procedures. 42 C.F.R. § 415.172.

46.   As alleged above, while the teaching physician must be physically present for all key and critical portions of the surgical procedure, Medicare also requires that, if a teaching physician cannot be physically present during the non-critical portions of the surgery, the physician must be "immediately available" to return to the procedure; that is, "he/she cannot be performing another procedure." CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, § 100.1.2 (Surgical Procedures), at A.

47.   Although a teaching physician may engage in two overlapping surgical procedures, the critical portions of the procedures cannot occur at the same time. CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, §100.1.2 (Surgical Procedures), at A.2.  When a teaching physician becomes involved in a second procedure, he or she must assign another qualified physician to be immediately available. CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, §100.1.2 (Surgical Procedures), at A.

48.   Medicare will not pay for surgeries where the key or critical portions of each surgery take place at the same time, also known as concurrent surgery.  Likewise, the American College of Surgeons differentiates between overlapping and concurrent surgeries, and expressly notes in its guidelines that Medicare will not pay physicians for concurrent surgeries.

49.   Although a teaching physician may bill for two overlapping surgeries that comply with the above-described rules, in the case of three overlapping surgeries, the role of the teaching physician is always classified as "supervisory service" to the hospital and is not billed as a physician service to a patient or payable under the physician fee schedule. CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, § 100.1.2. (Surgical Procedures), at A.2.

50.    A surgeon may bill for procedures as a co-surgeon only in specified circumstances. When a teaching physician submits a claim for payment as a co-surgeon at a teaching hospital, the physician must certify that no qualified resident was available. 42 C.F.R. §415.190; CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, §100.1.7 (Assistants at Surgery in Teaching Hospitals).

51.    Accurate documentation of medical treatment pertaining to surgeries is a condition of Medicare reimbursement, and CMS policy expressly limits payment to services for which there is documentation demonstrating the appropriate level of services required by the patient. *See* Medicare Carriers Manual, Part 3 CMS Pub. 14-3 (Rev. 1780); 42 C.F.R. § 415.172 et seq.

52.    *Informed Consent*.  Ensuring that Medicare patients have given adequate informed consent, prior to medical procedures, is a condition of participation in the Medicare program. *See* generally, 42 C.F.R. § 482.13 (Condition of participation: Patient's rights).  Obtaining proper informed consent is *also* a condition of payment. Specifically, the CMS State Operations Manual states that "[h]ospitals are required to be in compliance with the federal requirements set for the Medicare Conditions of Participation (COP) *in order to receive Medicare/Medicaid payment*." (*Emphasis Added*) CMS – State Operations Manual – Regulations and Interpretive Guidelines for Hospitals (Rev. 151; 11-20-15).

53.    Among other requirements, Medicare Conditions of Participation (COP) include numerous informed consent rules designed to protect Medicare patients. For example, patients must have involvement, inter alia, in their own plan of care and be offered the ability to refuse treatment. 42 C.F.R. § 482.13(b)(1) & (2).  Medicare patients also have the "right to receive care in a safe setting." 42 C.F.R. § 482.13(c)(2). A "properly executed" informed consent form must be included in each patient's chart prior to surgery. 42 C.F.R. § 482.51(b)(2)(Condition of participation: Surgical services); see also 42 C.F.R. § 482.24(c)(2)(B)(v) (Condition of participation: Medical

record services).

54. Medicare's adoption of interpretive guidelines for informed consent highlights the importance of compliance and the centrality of appropriate informed consent to participation in the payment under Medicare. 2007 CMS Hospital Interpretive Guidelines for Informed Consent, extensively revised in 2007, state that a "well designed consent process" would, among other things, include:

- The indications for the proposed surgery;
- *Who will conduct the surgical intervention* and administer the anesthesia;
- Whether physicians other than the operating practitioner, including but not limited to residents, will be performing important tasks related to the surgery, in accordance with the hospital's policies. Important surgical tasks include: opening and closing, dissecting tissue, removing tissue, harvesting grafts, transplanting tissue, administering anesthesia, implanting devices and placing invasive lines;

  o For surgeries in which residents will perform important parts of the surgery, discussion is encouraged to include the following:

  - That it is anticipated that physicians who are in approved post graduate residency training programs will perform portions of the surgery, based on their availability and level of competence;
  - That it will be decided at the time of the surgery which residents will participate and their manner of participation, and that this will depend on the availability of residents with the necessary competence; the knowledge the operating practitioner/teaching surgeon has of the resident's skill set; and the patient's condition; and
  - *Whether, based on the resident's level of competence, the operating practitioner/teaching surgeon will not be physically present in the same operating room for some or all of the surgical tasks performed by residents.*

(*Emphasis Added*). *See* April 13, 2007 CMS "Revisions to the Hospital Interpretive Guidelines for Informed Consent" at: https://www.cms.gov/medicare/provider-enrollment-and-certification/surveycertificationgeninfo/downloads/scletter07-17.pdf (last visited August 16, 2024).

//

## C. Private Insurer Guidelines

55. *Artificial Disc Replacement ("ADR") Guidelines*. ADR is a surgical procedure in which a diseased or damaged intervertebral disc of the spinal column is replaced with an artificial, man-made device. An artificial disc may be used to replace a disc in either the cervical spine (neck) or lumbar spine (lower back).

56. *Sub-Scheme 2.1: Cervical ADR Violations*. Cervical ADR (Single or Two Level) involves the insertion of a prosthetic device into the cervical intervertebral space with the goal of maintaining physiologic motion at the treated cervical segment. Private insurers and MAOs set the following guidelines for Cervical ADR procedures:

57. *Blue Cross*. As shown in *Figure 1* below, Cervical ADR is prohibited at 3 or more levels.

> Cervical Artificial Disc Replacement is NOT indicated when **any** of the following clinical scenarios exists (Davis, 2015):
> - Symptomatic multiple level disease affecting 3 or more levels
> - Adjacent level disease: degenerative disease adjacent to a previous cervical fusion
> - Infection (at site of implantation or systemic)

(*Figure 1*. Blue Cross of California Medical Policy for Cervical Spine Surgery at 7 (2017-2018), attached as **Exhibit 1**).

58. *Cigna*. As shown in *Figure 2* below, Cervical ADR is prohibited at multiple level implantation.

> Cigna does not cover the surgical implantation of a cervical intervertebral disc (IVD) prosthesis for ANY of the following because each is considered experimental, investigational or unproven:
> - The planned procedure includes the combined use of a prosthesis and spinal fusion (i.e., hybrid surgery)
> - Simultaneous multilevel implantation is planned
> - The individual had prior fusion at an adjacent cervical level

(*Figure 2*. Cigna Medical Coverage Policy: Intervertebral Disc (IVD) Prostheses at 2 (2013-2014), attached as **Exhibit 2**).

59. *United HealthCare Medicare Advantage Plans*. As shown in *Figure 3* below, Cervical ADR is prohibited at 3 or more levels.

//

Cervical artificial total disc replacement with an FDA-approved prosthetic intervertebral disc is proven and medically necessary in certain circumstances for treating one-level or two contiguous levels of cervical degenerative disc disease (C3 to C7) in a Skeletally Mature individual with symptomatic radiculopathy and/or myelopathy.

Cervical artificial disc replacement with an FDA-approved prosthetic intervertebral disc is proven and medically necessary for treating one level or two contiguous levels of cervical degenerative disc disease in a Skeletally Mature individual with a history of cervical spinal fusion at another level (adjacent or non-adjacent).

Cervical artificial disc replacement at one level combined with cervical spinal fusion surgery at another level (adjacent or non-adjacent), as part of the same surgical plan, is unproven and not medically necessary due to insufficient evidence of efficacy.

(*Figure 3*. UnitedHealthcare Commercial and Individual Exchange Medical Policy at 1 (2024), attached as **Exhibit 3**).

60. *Sub-Scheme 2.2: Lumbar ADR Violations*. Lumbar ADR is a surgical procedure on the lumbar spine that involves complete removal of the damaged or diseased lumbar intervertebral disc and implantation of an artificial disc. Private insurers and MAOs set the following guidelines for Lumbar ADR procedures:

61. *Blue Cross*. As shown in *Figure 4* below, Lumbar ADR is limited to one (single) level.

Artificial lumbar disc replacement is considered **not medically necessary** in all other circumstances, including artificial disc arthroplasty done at more than one spinal level, and hybrid (combination artificial disc and fusion) procedures.

(*Figure 4*. Blue Cross of California Medical Policy for Lumbar Spine Surgery at 5-6 (2017-2018), attached hereto as **Exhibit 4**).

62. *Cigna*. As shown in *Figure 5* below, Lumbar ADR is limited to one (single) level.

Cigna does not cover the surgical implantation of a lumbar intervertebral disc prosthesis for ANY of the following because each is considered experimental, investigational or unproven:

- The planned procedure includes the combined use of a prosthesis and spinal fusion (i.e., hybrid surgery).
- Simultaneous multilevel implantation is planned.

(*Figure 5*. *See* **Exhibit 2** at 2).

63. *United HealthCare Medicare Advantage Plans*. As shown in *Figure 6* below, Lumbar ADR is limited to one (single) level.

**Item/Service Description**

A. General

The lumbar artificial disc replacement (LADR) is a surgical procedure on the lumbar spine that involves complete removal of the damaged or diseased lumbar intervertebral disc and implantation of an artificial disc. The procedure may be done as an alternative to lumbar spinal fusion and is intended to reduce pain, increase movement at the site of surgery and restore intervertebral disc height. The Food and Drug Administration has approved the use of LADR for spine arthroplasty in skeletally mature patients with degenerative or discogenic disc disease at one level for L3 to S1.

(*Figure 6*. United HealthCare Coverage Summary: Artificial Disc Replacement, Cervical and Lumbar at 2 (2019), attached hereto as **Exhibit 5;** *See also* August 14, 2007 CMS National Coverage Determination "Lumbar Artificial Disc Replacement" at NCD - Lumbar Artificial Disc Replacement (LADR) (150.10) (cms.gov) (last visited August 29, 2024).

64.    As detailed above, Medicare guidelines require MAOs, such as UnitedHealthcare Medicare Advantage Plans, to comply with Medicare laws and regulations.

## V.    FACTUAL ALLEGATIONS

### A. Exposing Defendants' Fraud and Deception

65.    Relator, a surgeon with 19 years of experience, brings this *qui tam* action because he believes in the principle enshrined in the American Medical Association's ("AMA") Principles of Medical Ethics, that "a physician shall be dedicated to providing competent medical service with compassion and respect for human dignity;" and "a physician shall deal honestly with patients and colleagues, and strive to expose those physicians deficient in character or competence, or who engage in fraud or deception."

66.    Starting in 2005, Relator had surgical privileges at Cedars-Sinai following the completion of his spinal fellowship at Cedars-Sinai Institute for Spinal Disorders.

67.    As detailed below, Relator first learned of the unsafe practices at Cedars-Sinai in September of 2009.  Relator became aware of *both schemes* through patients who required follow-up treatment and through additional investigations and discussions with other surgeons at Cedars-Sinai.

68.    Starting in December of 2009, Relator voiced his concerns to Cedars-Sinai executives and staff, including but not limited to Dr. Gewertz (Professor of Surgery and Surgeon in Chief), Dr. Goldstein (Medical Director of Cedars-Sinai Spine Center), Dr. Brien (Clinical Professor of Surgery and Executive Vice Chairman, Department of Surgery), and Bryan Croft (Executive Vice President and Chief Operating Officer) regarding the concurrent surgery scheme perpetrated by Delamarter, Bae, and Rasouli.  These concerns went unaddressed.

69.    Dr. Melamed maintained surgical privileges at Cedars-Sinai until 2015. He also had surgical privileges at Marina Del Rey Hospital since 2006.  In 2015, Cedars-Sinai acquired Marina Del Rey Hospital and its employees, including Dr. Melamed.  Dr. Melamed continues to perform surgeries exclusively at Marina Del Rey Hospital.

70.    Starting in January of 2015, Relator voiced his concerns to Cedars-Sinai executives and staff, including but not limited to Dr. Gewertz, Dr. Goldstein, and Bryan Croft regarding the ADR surgery scheme perpetrated by Lanman, Cuellar, and Kropf.  These concerns went unaddressed.

71.    Cedars-Sinai has turned a blind eye and benefited from the submission of multiple claims for these two schemes all while its patients are irreversibly harmed, in permanent pain and requiring additional revision surgeries.

**B. *Scheme 1*: Concurrent Surgeries**

72.    From at least April 2009 to the present, Delamarter, Bae, and Rasouli scheduled and performed two or even three concurrent surgeries in violation of CMS consent and concurrent surgery guidelines.

73.    *Summary of Relevant Guidelines*. Concurrent surgeries occur when a surgeon divides his/her attention between multiple (2 or 3) operating rooms over several hours.

74.    CMS defines concurrent surgeries as those where the critical or key parts of two surgeries are performed by the same teaching physician at the same time.

Senate Finance Committee Report, "Concurrent and Overlapping Surgeries: Additional Measures Warranted" (Dec. 6, 2016). The teaching physician is not allowed to bill for such surgeries. The American College of Surgeons ("ACS") considers surgeries to be concurrent if the critical components of the two surgeries partially or fully overlap. As the Report notes, the ACS guidelines reflect what is necessary for patient safety (pp.4-5). Per the ACS, the primary attending surgeon is personally responsible for the patient's welfare throughout the operation. In general, the patient's primary attending surgeon should be in the operating suite or should be immediately available for the entire surgical procedure.

75. *Cedars-Sinai Policy and Procedures*. Cedars-Sinai shares CMS's understanding regarding teaching physicians. Cedars-Sinai policy states that "fellows without Medical Staff privileges, and all residents, may not perform operative procedures without the supervision of the attending surgeon. The attending Surgeon shall be present in the operating room where the case is taking place during the critical portion of the procedure. The Attending Surgeon will be in the hospital and immediately available at all times during the procedure. At the request of any member of the operating team, the attending surgeon will return to the operating room immediately" (i.e., *not performing another procedure*). Cedars-Sinai Department of Surgery Residency Program Handbook (2021-2022). (*Emphasis added*). (**Exhibit 6**).

76. The teaching physician may only leave the first surgical procedure and/or commence the second procedure when the key or critical portion(s) of the first procedure is complete. Surgical residents or fellows may finish the non-critical portion(s). Surgeries in compliance with this rule are often called overlapping surgeries.

77. During surgery the circulating nurse is required to "control the environment by keeping traffic flow into and out of the Operating Room to an absolute minimum." Cedars-Sinai Medical Center Policy and Procedure – Title: Guidelines: Circulator Responsibilities, Operating Procedures: OR/Anesthesia/Surgery Center

(Effective Date: 9/23/2010). (**Exhibit 7**).  This includes tracking who comes in and out of operating rooms.

78.    Per Cedars-Sinai policy, physicians duly registered in computer systems incorporating an electronic signature component maintained by Cedars-Sinai Medical Center ("CSMC") may review, approve, and sign "on-line" documents and entries. Only the physician who dictated a report or made the electronic entry may access that report for approval and computerized signature. Cedars-Sinai Medical Center Policy and Procedure – Title: Electronic Signature of Documents / Entries Policy: Health Info. Dept. (Effective Date: 10/23/2009). (**Exhibit 8**).

79.    It is also the policy of Cedars-Sinai that all providers shall be responsible for ensuring that documentation requirements as established by the following entities: CSMC Bylaws Rules and Regulations, the Joint Commission, Department of Health and Human Services, California Medical Association, Allied Health Professionals Rules and Regulations, and the Centers for Medicare and Medicaid Services (CMS) be met.   Cedars-Sinai Medical Center Policy and Procedure – Documentation Requirement Policy: Record Completion (Effective Date: 12/12/2013). (**Exhibit 9**).

80.    Cedars-Sinai's policies and procedures regarding the creation of intra-operative nursing logs are guided by regulations put forth by CMS, Joint Commission, and Association of Operative Registered Nurses ("AORN").

81.    _Additional Guidelines Relevant to the Concurrent Surgeries Scheme_.

82.    _"Time Out" Policy and Procedure_.  The "time out" is a "surgical pause" preceding incision, during which all operating-room activity briefly ceases, and the surgical team completes a verbal checklist (confirming, among other things, the patient's identity, the incision site, and the procedure to be performed), and discusses the key and critical components of the procedure.

83.    The "time out" is meant to help prevent so-called "sentinel" events, where the patient suffers severe and unanticipated surgical complications.  According to the American College of Surgeons, it is the _primary surgeon's_ responsibility to lead

the surgical team through the "time out."  Likewise, the World Health Organization's Joint Commission has repeatedly stated that "all [surgical] team members be actively involved in the [time out] process."  (*Emphasis added*).

84.    According to Cedars-Sinai policy, the "time out" is a key and critical portion of every surgical procedure. *See* Cedars-Sinai Preparing for Your Surgery or Procedure. (**Exhibit 10**).

85.    *Accurate Recordkeeping*.  Accurate documentation of medical treatment pertaining to surgeries is a condition of Medicare reimbursement, and CMS policy expressly limits payment to services for which there is documentation demonstrating the appropriate level of services required by the patient.

86.    *Informed Consent*.  Moreover, obtaining proper informed consent is a condition of payment but also critical for concurrent surgeries because of the inevitable risks that come with the inability to competently attend to two or three surgical patients at the same time.

87.    Common issues and concerns include the following:

   a.  Surgeons performing concurrent surgeries are unable to respond quickly when an urgent need arises;

   b.  Longer anesthesia time for patients waiting for the attending surgeon who was delayed in the first procedure;

   c.  Inadequate supervision of surgical residents and scope of practice creep with surgical assistants when the primary surgeon leaves for a second procedure;

   d.  Operating Room (OR) nurses reporting fears of "patient abandonment" to administration;

   e.  Inadequate pre-procedure briefings and the absence of surgical debriefs; and

   f.  Patients suffering complications.

88.    *Cedars-Sinai Knowingly Gave Delamarter Unchecked Authority to*

*Operate Concurrent Surgeries in Violation of Medicare Rules*.  On November 24, 2008, Cedars-Sinai and Delamarter entered into an Administrative Services Agreement.  Delamarter was named full time equivalency faculty, Co-Director of the Cedars-Sinai Spine Center, and Vice Chair of Spine Services in Cedars-Sinai's Department of Surgery.  The terms of the agreement were effective until December 4, 2013.  As Vice Chair and Co-Medical Director, Delamarter was the highest-ranking physician and faculty member with administrative authority at Cedars-Sinai.  His duties included oversight of all physicians within the surgery department, administrative oversight of clinical programs, establishing regular meetings with other departments, establishing research programs, teaching, assisting in the oversight and coordination of Spine Services fellowship programs, fundraising, and ensure compliance by Spine Services with state and federal laws.

89.    As the vice chair of the department of surgery at Cedars-Sinai, Delamarter's role in academics included the spine fellowship program that he oversaw during his tenure.  Fellowships, including spine fellowships, are run out of the graduate medical education department.  Delamarter was involved in the recruitment or approval of the fellows selected for the program, trained and educated fellows.

90.    The Administrative Services Agreement also provided Delamarter and his physician associates, including Bae, Kropf, and Rasouli to full access of "block" operating room time and scheduling based on volume need, which was estimated at two rooms, five days per week.

91.    On April 27, 2009, Cedars-Sinai formally announced that Delamarter and his surgical team, Defendants Bae, Kropf, and Rasouli were joining the faculty of Cedars-Sinai.

92.    Drs. Goldstein and Brien were actively involved in recruiting Delamarter, Bae, Kropf, and Rasouli on behalf of Cedars-Sinai.

93.    Throughout the relevant period of this First Amended Complaint, Delamarter, Bae, and Rasouli were teaching physicians at Cedars-Sinai.

94.     Bae and Delamarter hosted Clinical Symposium Series for the purposes of educating spinal surgeons through professor lectures.  These educational symposiums were annual, featured the header "Special Invite," and were posted on Cedars-Sinai's website.

95.     The 2012 Clinical Symposium Series, Cedars-Sinai listed Delamarter, Bae, and Rasouli as Cedars-Sinai Faculty:



96.     When Delamarter retired in May 2013, Bae and Rasouli used the framework established by Delamarter to continue to perform concurrent surgeries at Cedars-Sinai.

97.     *Exposing the Scheme Work*.  Despite administrative responsibilities as Vice Chair and Co-Medical Director, Delamarter maintained an inordinately busy surgical practice.

98.    Delamarter, along with Rasouli and Bae were among Cedars-Sinai's most active surgeons, performing and assisting with hundreds, and sometimes thousands, of surgical procedures per year.

99.    With free reign, Delamarter, Bae, and Rasouli were able to block multiple rooms to perform concurrent surgeries.

100.    As teaching physicians, many of these surgeries scheduled by Delamarter, Bae, and Rasouli included a fellow and/or resident surgeon. (*See* Cedars-Sinai fellows and residents from 2008 to present at **Exhibit 11**).

101.    For every surgery at Cedars-Sinai, intra-operative nursing logs show exactly what time Delamarter, Bae, and Rasouli came in the room, were performing surgery and then left the room.

102.    The intra-operative notes show that Delamarter, Bae, and Rasouli were in multiple operating rooms at the same time.

103.    The intra-operative notes show that Delamarter, Bae, and/or Rasouli, acting as primary surgeon, were in multiple operating rooms during the critical part of surgery.

104.    The intra-operative notes show that Delamarter, Bae, and/or Rasouli, acting as primary surgeon, were in multiple operating rooms during the time out period.

105.    The intra-operative notes show that Delamarter, Bae, and/or Rasouli allowed residents and fellows to perform operative procedures without the supervision of the primary surgeon.

106.    The intra-operative notes show that Delamarter, Bae, and/or Rasouli allowed residents and fellows to perform operative procedures without being immediately available because they were performing another procedure.

107.    The intra-operative notes show that Delamarter, Bae, and/or Rasouli as the primary surgeon failed to be personally responsible for their patient's welfare.

108.    Despite the intra-operative report showing Delamarter, Bae, and/or

Rasouli in multiple operating rooms, they submit bills to Medicare Part B as a primary surgeon for their own professional fees falsely certifying that they were present for the "time out" period and "critical part or surgery".

109.    Despite the intra-operative report showing Delamarter, Bae, and/or Rasouli in multiple operating rooms, Delamarter, Bae, and Rasouli submit bills to Medicare as teaching physicians in violation of Medicare guidelines.

110.    Despite the intra-operative report showing Delamarter, Bae, and/or Rasouli in multiple operating rooms, Delamarter, Bae, and Rasouli submit bills to Medicare as the primary surgeon using false and inaccurate intra-operative reports.

111.    _False and Inadequate Record Keeping_.    In Relator's investigation, he was privy to the surgical records generated by physicians performing concurrent surgeries. He noticed that these records routinely failed to provide an accurate accounting of the teaching surgeon's involvement in the case, including the nature of the procedures deemed to be "key and critical," the time in which he entered and exited the surgery room, whether he was able to return to the surgery if necessary, and/or whether another surgery was conducted at the same time.

112.    Except in rare cases where the teaching surgeon was present for the entire procedure, none of the records kept by teaching physicians at Cedars-Sinai would have allowed a regulator to clearly infer that the teaching physician was immediately available to return to either procedure in the event of complications.

113.    Also as discussed above, the intra-operative nursing notes have Delamarter, Bae, and Rasouli entering and exiting operating rooms at Cedars- Sinai while simultaneously in other operating rooms at the same time.  Failure to document appropriately work on concurrent surgeries is a condition of payment. 42 C.F.R. § 415.172(b).  Cedars-Sinai, Delamarter, Bae, and Rasouli submitted false claims to the government for all concurrent surgeries where the surgeon's records do comply with regulations.

114.    _Patient ETT_.  For example, on or about February 26, 2013, patient ETT

was permanently harmed by a procedure that was purportedly performed by Delamarter, primary surgeon, and Rasouli at Cedars-Sinai while running three surgeries.

115.   Cedars-Sinai nursing intraoperative records show that on February 26, 2013, Delamarter was attending to a patient in operating room No. 86 from 6:54 a.m. until 10:03 a.m. (**Exhibit 12**).   However, Delamarter's Attestation in his progress notes state that sometime between 9:00 a.m. and 9:39 a.m., he was attending to ETT during his "time out" period. (**Exhibit 13**).   And also, in direct contradiction to the operative records proffered by Delamarter that purportedly shows he was attending to ETT in operating room 82 at 9:55 a.m. he was also in operating room 86 at the same time.  (**Exhibit 14 and 15**).

116.   The Cedars-Sinai nursing intraoperative records show the times that Delamarter and Rasouli went in and out of the operating rooms.  Based on the Cedars-Sinai nursing intraoperative records, Delamarter and Rasouli were in three places at once (see below).

| DELAMARTER | TIME IN | TIME OUT |
|---|---|---|
| Operating Room 82 | 7:26 AM | 9:41 AM |
| Operating Room 86 | 6:54 AM | 10:03 AM |
| ETT Operating Room 82 | 9:55 AM | 1:48 PM |
| ETT Operating Room Time Out | 9:00 AM | 9:39 AM |
| | | |
| RASOULI | TIME IN | TIME OUT |
| Operating Room 82 | 8:30 AM | 8:55 AM |
| Operating Room 86 | 7:01 AM | 10:03 AM |
| ETT Operating Room 82 | 11:04 AM | 1:48 PM |

(*See* **Exhibits 12 through 15**).

117.   Delamarter, and Rasouli failed to provide an accurate accounting of their

involvement in the case, including the nature of the procedures deemed to be "key and critical," the time in which he entered and exited the surgery room, whether they were able to return to the surgery if necessary, and/or whether another surgery was conducted at the same time.

118.   Dr. Taz Yusafali, the anesthesiologist for patient ETT, informed Relator that Delamarter was running multiple rooms, and Delamarter did not come into the operating room until the end of the surgery.

119.   By falsely attesting that they were present for the "time out", throughout the entire surgical procedure, and/or for all key and critical portions of the procedure, and then personally submitting or causing Cedars-Sinai to submit a claim for reimbursement to CMS for physician and hospital services, Cedars-Sinai, Delamarter, and Rasouli made or caused to be made a false statement material to a claim for payment to the government.

120.   Furthermore, the consent form utilized by Cedars-Sinai for ETT's February 26, 2013 surgery has no mention that Delamarter, the primary surgeon, scheduled and performed multiple surgeries at once. (**Exhibit 16**).

121.   _Failure to Obtain Informed Consent_.  Over the years, Defendants have utilized various informed consent forms – which are to be reviewed and signed by patients before surgery – but none has informed patients that their surgeon would not be present during the entire surgery because the surgeon had intended to perform another surgery at the same time.

122.   Specifically, a consent form utilized by Cedars-Sinai that is dated February 26, 2013 only notes that Cedars-Sinai "is a teaching hospital and such the training of physicians and surgeons, nurses, and other health care personnel takes place at Cedars-Sinai Medical Center. I understand that nurses, physicians, and other health care personnel in training may participate in the operation or special diagnostics or therapeutic procedures specified above under the supervising physician or surgeon names above, and I consent thereto." (_Id_.)

123.   To get around, Cedars-Sinai created a consent form with an exhaustive list of all physicians who conceivably could be involved in a patient's surgery, including residents, and including physicians who might not even be present at the hospital on the date of the procedure.  This kitchen sink approach to a consent form contained the list of physicians but is not effective notice to patients, especially when presented to them at a time when they are too ill or too worried about their impending surgeries to realize that they are consenting to a revolving door approach to the surgery they reasonably believe will be done by the primary surgeon who scheduled it and had examined them.

124.   As an example, attached hereto as **Exhibit 17** is a July 26, 2019 operative report that list a total of eight surgeons for a "C3-5 total disc replacement; cervical decompression posterior C4-6" surgery, including Defendants Rasouli (primary surgeon) and Cuellar.

125.   Cedars-Sinai also has no official policy requiring anyone at Cedars-Sinai to disclose concurrent surgeries to patients who are affected by the practice.

126.   With the block rooms reserved for Delamarter, Bae, and Rasouli, Cedars-Sinai's over inclusive consent, and no official policy from Cedars-Sinai regarding concurrent surgeries, Delamarter, Bae and Rasouli were able to schedule multiple surgeries at once and bounce around the operating rooms.

127.   Relator has first-hand knowledge that patients were never told and did not otherwise know that their surgeon was scheduled to perform two or more surgeries at the same time.  To the contrary: patients routinely did not find out that their primary surgeon (either Delamarter, Bae or Rasouli) whom they had scheduled the surgery was not present and/or involved in the case until a complication occurred, if ever.

128.   Instead of meeting the CMS disclosure and informed consent, Cedars-Sinai actively sought to conceal its concurrent surgery practice from patients with its kitchen sink approach to a consent form.

129.   In sum, the consent forms and Cedars-Sinai's policies and practices fail

1    to meet criteria set out in the Medicare regulations, and guidance documents,

2    therefore, surgeries billed by Cedars-Sinai for all concurrent surgeries are false claims.

3    130.    Specifically, as the 2016 Senate Finance Committee Report points out, at

4    page 10, CMS's COPs and corresponding interpretive guidelines, among other things:

> require hospitals to take certain steps to ensure that patients
> consent to planned surgeries. For example, this guidance states that
> a well-designed informed consent policy should include a
> discussion of a surgeon's possible absence during part of the
> patient's surgery, during which residents will perform surgical
> tasks, and that the informed consent policy should assure the
> patient's right to refuse treatment.

11    131.    Submitting claims for concurrent surgeries where valid informed consent

12    has not been obtained, much less documented in the patient's file, is material.

13    Defendant has failed to provide full and proper informed consent with regard to the

14    practices alleged herein because doing so would have a natural tendency to influence

15    or be capable of influencing a patient's decision to consent to surgery under

16    Defendants' practices.  Because a patient is the initial gatekeeper for the payment by

17    any government third party payers, the matter of informed consent is material because,

18    inter alia, it has a natural tendency to influence, or be capable of influencing, the

19    payment or receipt of government money.

20    132.    Along the same lines, failure to obtain informed consent violates long-

21    standing rules of ethics.  According to the AMA, "[a] surgeon who allows a substitute

22    to operate on his or her patient *without the patient's knowledge or consent is deceitful*.

23    The patient is entitled to choose his or her own doctor and should be permitted to

24    acquiesce or refuse the substitution." (*Emphasis added*). See AMA Council on Ethical

25    and Judicial Affairs Opinion E-8.16 "Substitution of Surgeon without Patient's

26    Knowledge or Consent." The Ethics Opinion goes on to state:

> Under the normal and customary arrangement with patients ... the
> operating surgeon is obligated to perform the operation but may be
> assisted by residents or other surgeons. With consent of the patient,

it is not unethical for the operating surgeon to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, i.e., the surgeon must scrub. If a resident or other physician is to perform the operation under non-participatory supervision, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement in the consent. Under these circumstances, it is the resident or other physician who becomes the operating surgeon.

133. Likewise, Dr. Mininder S. Kocher in an article entitled Ghost Surgery: The Ethical and Legal Implications of Who Does the Operation, J Bone Joint Surg. Am. 84: 148-150 (2002), concluded that "[t]he substitution of an authorized surgeon by an unauthorized surgeon or the allowance of unauthorized surgical trainees to operate without adequate supervision constitutes 'ghost surgery'. These practices are legally and ethically iniquitous. Ghost surgery flies in the face of case law and violates an individual's right to control his or her own body and violates that person's right to information needed to make an informed decision."

134. Cedars-Sinai, Delamarter, Bae, and Rasouli submitted false claims to the government for all Medicare patients receiving surgery in tandem or concurrently with one or more other patients because the hospital did not obtain valid informed consent from these patients.

135. *Scheme 1: Concurrent Surgeries – Additional Specific Examples*.

136. *Patient DS*.  On or about June 3, 2010, patient DS was permanently paralyzed by a procedure performed by Delamarter at Cedars-Sinai while running concurrent surgeries.  Patient DS had no knowledge, let alone never gave informed consent to Delamarter running multiple operating rooms.  Dr. Salvador Brau, the vascular surgeon for the procedure informed Relator that Delamarter was not in the room, and he was pressured to "speed up the surgery".  Several surgeons at Cedars-Sinai, including Drs. J Patrick Johnson (former Director of Cedars-Sinai Institute for Spinal Disorders) and Robert Pashman (former Director of Scoliosis at Cedars-Sinai)

lodged formal complaints with Defendant Brien, and Linda Procci, Vice President of Operations at Cedars-Sinai, and Dr. Bruce Gewertz.

137.   *Patient SK*.  On or about June 9, 2010, patient SK suffered permanent vocal cord damage and difficulty swallowing following a procedure performed by Bae and Delamarter at Cedars-Sinai while running concurrent surgeries.  Patient SK had no knowledge, let alone never gave informed consent to Bae and Delamarter running multiple operating rooms.

138.   *Patient JM*.  On or about September 21, 2010, patient JM was permanently paralyzed by a procedure performed by Delamarter and Rasouli at Cedars-Sinai while running concurrent surgeries.  Patient JM had no knowledge, let alone never gave informed consent to Delamarter and Rasouli running multiple operating rooms.  Dr. Lorraine Sdrales, a well-respected anesthesiologist at Cedars-Sinai and the anesthesiologist for patient JM, informed Relator that Delamarter was running multiple rooms, and he did not come into the room until the last few minutes of the four-hour surgery.  Dr. Sdrales lodged a formal complaint to Cedars-Sinai directors, including Drs. Ron Wender, Julian Gold, and Bruce Gewertz about Delamarter and Rasouli running multiple rooms.  She also asked Cedars-Sinai to no longer schedule her for spinal procedures with Delamarter and his team because she could no longer tolerate the concurrent surgeries. A few days following his conversation with Dr. Sdrales, Relator once again voiced his concerns to Defendants Brien and Goldstein about Delamarter, Bae, and Rasouli routinely running concurrent surgeries.  Relator never heard back from them.

139.   These are just some examples of Cedars-Sinai, Delamarter, Bae, and Rasouli's concurrent surgery scheme submitted to CMS for reimbursement without patients informed consent.

140.   *Firsthand Knowledge and Scienter*.  In September of 2009, Relator first learned that Delamarter, Bae and Rasouli were performing concurrent surgeries at Cedars-Sinai.  On a flight from Los Angeles to San Antonio for the annual scoliosis

research society meeting, J. Patrick Johnson, M.D. (Former Director of Cedars-Sinai
Institute for Spinal Disorders) informed Relator that Delamarter was "assaulting"
patients by performing concurrent surgeries resulting in complications and significant
injury.

141.  Dr. Johnson filed complaints with Cedars-Sinai, including Drs.
Goldstein, Brien, and Gewertz and was upset that Cedars-Sinai was putting profits
before patient care.

142.  This introduction into Cedars-Sinai, Delamarter, Bae, and Rasouli's
unsafe practices led to years of first-hand experiences with patients and other Cedars-
Sinai surgeons regarding Delamarter, Bae, and Rasouli's concurrent surgery scheme.

143.  For example, in December of 2009, Relator and Dr. John Regan (Former
Director of Cedars-Sinai Institute of Spinal Disorders) discussed Delamarter's
concurrent surgery scheme.  Relator and Dr. Regan were concerned about the high
patient complication rate.  Dr. Regan voiced his concerns to Cedars-Sinai through Drs.
Goldstein and Gewertz about Delamarter, Bae and Rasouli's unsafe and unethical
concurrent surgery scheme.

144.  In early January 2010, Relator also expressed his concerns to Dr.
Goldstein about Delamarter, Bae, and Rasouli's concurrent surgery scheme, echoing
the previous concerns of Drs. Johnson and Regan.

145.  But by this point, Drs. Goldstein and Brien were referring all spine
surgery patients to Delamarter, Bae, Kropf, and Rasouli. Dr. Goldstein simply told
Relator he, "would look into it."

146.  Because Cedars-Sinai surgeons perform approximately 32,000 surgeries
each year, Relator's concern for patient safety during concurrent surgeries intensified.

147.  From March 2011 to April 2015, Relator continued to complain to
Cedars-Sinai, including Drs. Goldstein and Brien about the concurrent surgeries
performed by Delamarter, Bae, and Rasouli.

148.  Many of these complaints were ignored.  Dr. Brien even told Relator to

"worry about your own patients."

149.   When Delamarter retired in 2013, Rasouli and Bae continued the concurrent surgery scheme.  Rasouli and Bae would schedule concurrent surgeries as the primary surgeon.  They would list Drs. Ehsan Saadat, Eli Baron, Edward Nomoto, George Hanna, Albert Wong, and Sang Kim as the assistant surgery.

150.   Relator's investigation uncovered that a majority of the time, Drs. Ehsan Saadat, Eli Baron, Edward Nomoto, George Hanna, Albert Wong, and Sang Kim would end up performing the majority of the procedure, including the critical part of surgery, while Rasouli and Bae were in another operating room.

151.   Despite Drs. Ehsan Saadat, Eli Baron, Edward Nomoto, George Hanna, Albert Wong, and Sang Kim performing the majority of the surgery, Rasouli and Bae would still submit claims to CMS and private insurers as the primary surgeon.

152.   Drs. Ehsan Saadat, Eli Baron, Edward Nomoto, George Hanna, Albert Wong, and Sang Kim now refuse to assist Rasouli and Bae during concurrent surgeries because of the unethical billing practices and performance of concurrent surgeries on a patient that is completely unaware that his primary surgeon is leaving the operating room for another surgery.

153.   On October 12, 2015, Marie Hill, a circulating nurse for Cedars-Sinai testified: (1) she worked as a circulator for surgeries in which Delamarter was a primary surgeon at least twice a week between the years of 2008 to 2013 and (2) that in the years roughly between 2008 and 2013, Delamarter would leave the operating room during surgeries and return before they were done.

154.   Relator's investigation also uncovered that Cedars-Sinai's CEO, Thomas M. Priselac was aware of Delamarter, Bae, and Rasouli's concurrent surgery scheme. In April of 2018 at a UCLA lecture, a former patient of Delamarter and Rasouli shared his experience and injuries with Mr. Priselac as a result of a concurrent surgery performed by Delamarter and Rasouli in 2013.  The patient addressed the public health concerns regarding Cedars-Sinai's concurrent surgery fraud scheme, including putting

a patient under prolonged periods of anesthesia and taking away his right to informed consent.  Mr. Priselac refused to discuss the issue.

155.  *Medicare Damages*. Bills for "physician services" are generally submitted to, and paid by, Government Health Benefit Programs in the following manner: (1) doctor defendant dictates, reviews, and signs an operative note, which – among other things – states that he served as the primary surgeon or co-surgeon for the procedure, attests that he was present for the key and critical portions and/or the entirety of the surgical procedure, and notes the times at which he entered and exited the operating room; (2) that operative note is then sent to Cedars-Sinai's central coding and billing department, where a Cedars-Sinai billing employee interprets the operative note and, through the use of a medical software program, assigns Current Procedural Terminology ("CPT") or Healthcare Common Procedure Coding System ("HCPCS") codes to the procedure; (3) Cedars-Sinai then submits the bill with the applicable CPT or HCPCS codes for the surgical procedure, as well as any and all other applicable charges and ancillary fees (for, e.g., anesthesiology, radiology, and/or laboratory services), to the Government Health Benefit Programs; (4) the Government Health Benefit Program issues payment directly to Cedars-Sinai; and (5) Cedars-Sinai retains a percentage of the dollars received from the Government Health Benefit Program and allocates the remaining funds to other departments that rendered services or goods associated with the surgical procedure.

156.  Cedars-Sinai, Delamarter, Bae, and Rasouli have submitted claims for reimbursement to CMS totaling tens of millions of dollars between 2009 to the present, for the hospital stays, procedures, and other services, and received tens of millions of dollars from the Government for the same.

157.  On information and belief, many of those hospital stays, procedures, and other services would not have been necessary, but for defendants' conduct, including Delamarter, Bae, and Rasouli's concurrent surgical practice, failure to progress surgeries efficiently, and/or failure to get patients informed consent.

### C. *Scheme 2*: Falsified Operative Reports in Artificial Disk Replacement Surgeries

158.   From 2014 to the present, Defendants Cuellar, Lanman, and Kropf performed experimental/investigational cervical and lumbar ADR surgeries outside the guidelines of private insurers and CMS.

159.   Cedars-Sinai's Spine Center advertised ADR surgery on their website, stating: "Artificial disc replacement [cervical and lumbar] offers a reversible, viable alternative to spinal fusion… Spine surgeons at the Cedars-Sinai Spine Center are at the forefront of development and evaluation of a safe and effective artificial disk…"; ADR is listed as the first treatment option for degenerative disk disease on their website. Next to the content is an image: "FIND A DOCTOR CALL 1-800-CEDARS-1, 1-800-233-2771."

160.   Many of Cuellar, Lanman, and Kropf's patients are enrolled with private insurers and/or in Medicare Advantage plans under Medicare Part C.

161.   As detailed in paragraphs 55-64 above, private insurers and CMS limit the "levels" a surgeon can safely perform a cervical and lumbar ADR surgery by providing specific guidelines for reimbursement. (*See* **Exhibits 1-5**).

162.   Procedures performed outside of these guidelines are considered experimental/investigational.  A treatment, procedure, or drug is investigational when it has not been recognized as safe and effective for use in treating the particular condition in accordance with generally accepted professional medical standards.  This includes services where approval by the federal or state governmental is required prior to use, but has not yet been granted. (*Id*.)

163.   *How the Scheme Works*.   Defendants Cuellar, Lanman, and Kropf perform an experimental/investigational cervical and lumbar ADR surgery outside private insurer or CMS guidelines.

164.   Cuellar, Lanman, and Kropf then falsify the operative report to show that procedure was performed within the private insurer or CMS guidelines.

165.    However, when comparing the operative report with the x-ray imaging for the cervical and/or lumbar ADR surgery, it clearly shows an experimental/investigational multilevel procedure was performed outside private insurer and CMS guidelines.

166.    Cedars-Sinai, Cuellar, Lanman, and Kropf then submit claims to Blue Cross, Cigna, and United HealthCare Medicare Advantage Plans using falsified operative reports.

167.    On information and belief, Cedars-Sinai, Cuellar, Lanman, and Kropf also submit fraudulent claims using falsified operative reports for ADR surgeries to other private insurers and MAOs, including but not limited to: Adventist Health, Aetna, Aetna – Medicare, Blue Cross - Medicare Advantage, Blue Shield, HealthNet, and Humana National POS.

168.    *Sub-Scheme 2.1: Cervical ADR Violations*.  Under the private insurance and MAO guidelines, and generally accepted industry standards, surgeons are restricted from performing 3 or more level Cervical ADR surgery or ADR surgery adjacent to a cervical fusion. (*See* **Exhibits 1-3**).

169.    Despite these protections, Lanman, Cuellar, and Kropf are performing prohibited 3 or 4 level Cervical ADR surgeries and falsifying operative reports to make it appear that a single-level cervical ADR was performed.

170.    Cedars-Sinai, Lanman, Cuellar, and Kropf are then submitting claims for reimbursement to private insurers and MAOs using the operative reports that show a single-level cervical ADR.

171.    However, a review of the x-ray imaging clearly shows Lanman, Cuellar, and Kropf performed multilevel cervical ADR surgery.

172.    The x-ray imaging is not submitted to private insurers or CMS for reimbursement.  Thus, the payors are not aware that Cedars-Sinai, Lanman, Cuellar, and Kropf submitted a falsified operative report in its request for reimbursement.

173.    Cuellar, Lanman, and Kropf falsify operative reports for the sole purpose

1  of seeking reimbursement.

2      174.   Upon information and belief, Cedars-Sinai receives approximately $50-
3  60,000 per patient for Cervical ADR procedures from private insurers and
4  approximately $25-30,000 per patient for Cervical ADR procedures from CMS.

5      175.   Upon information and belief, Lanman, Cuellar, and Kropf receive
6  between $20-40,000 per patient for Cervical ADR procedures from private insurers
7  and between $7-$30,000 per patient for Cervical ADR procedures from CMS.

8      176.   *Sub-Scheme 2.1: Cervical ADR Violations – Specific Examples*.

9      177.   *Patient D*. Medical records for patient "D" including: a November 5,
10  2019 Operative Report (attached hereto as **Exhibit 18**), Cedar-Sinai Medical Center
11  Fact Sheet (attached hereto as **Exhibit 19**), Pre-Procedure Note and Attestation
12  (attached hereto as **Exhibit 20**) and ORT Brief Post Op Note (attached hereto as
13  **Exhibit 21**).

14      178.   The co-surgeons are listed as Cuellar and Lanman.

15      179.   The preoperative records describe the surgery accurately.  For example,
16  the November 5, 2019 preoperative procedure is listed as C3-C7 anterior cervical
17  diskectomies with disc replacements.  The operation to be performed states, "Anterior
18  cervical discectomy and insertion of artificial disk C5-6, anterior cervical discectomy
19  and insertion of artificial disk C6-7, anterior cervical diskectomies C3-4, C4-5, use
20  and interpretation of intraoperative fluoroscopy, use of microscopy for surgery, use of
21  intraoperative neuro monitoring SSEPs and MEPs". (*See generally* **Exhibit 17**).

22      180.   The operative report only mentions insertion of artificial disks at 2-levels:
23  C5-6 and C6-7. (*Id.*)

24      181.   The post-operative x-ray clearly shows that Cervical ADR surgery was
25  performed at 4-levels:  C3-4, C4-5, C5-6 and C6-7. (Imaging Studies attached hereto
26  as **Exhibit 22**).

27      182.   At the time of the procedure, patient D was insured by Blue Cross PPO.
28  As detailed above, Blue Cross approves Cervical ADR procedures at only 2-levels.

183.    Cedars-Sinai, Cuellar, and Lanman submitted a fraudulent claim using the November 5, 2019 falsified operative report that only mentions a 2-level Cervical ADR at C5-6 and C6-7.  The operative report submitted for reimbursement fails to include the C3-4 and C4-5 artificial disks also clearly shown in the imaging.

184.    This procedure was outside the private insurer guidelines and would not have been subject to reimbursement but for Cedars-Sinai, Cuellar, and Lanman's submission of the fraudulent operative report.

185.    _Sub-Scheme 2.2: Lumbar ADR Violations_.  Under the private insurance and MAO guidelines, and generally accepted industry standards, surgeons will be approved for single (one) level Lumbar ADR surgery and restricted from performing hybrid fusion surgery with ADR. (*See* **Exhibits 2, 4, 5**).

186.    Similar to the Cervical ADR surgeries, Lanman, Cuellar, and Kropf are performing prohibited multilevel (i.e. more than one level) ADR procedures and/or hybrid procedures and falsifying operative reports to make it appear that a single-level lumbar ADR was performed.

187.    Cedars-Sinai, Lanman, Cuellar, and Kropf are then submitting claims for reimbursement to private insurers and MAOs using the operative reports that show a single-level lumbar ADR.

188.    However, a review of the x-ray imaging clearly shows Lanman, Cuellar, and Kropf performed multilevel lumbar ADR surgery.

189.    The x-ray imaging is not submitted to private insurers or CMS for reimbursement.  Thus, the payors are not aware that Cedars-Sinai, Lanman, Cuellar, and Kropf submitted a falsified operative report in its request for reimbursement.

190.    Cuellar, Lanman, and Kropf falsify operative reports for the sole purpose of seeking reimbursement.

191.    Upon information and belief, Cedars-Sinai receives approximately $100-120,000 per patient for Lumbar ADR procedures from private insurers and approximately $50-60,000 per patient for Lumbar ADR procedures from CMS.

192.    Upon information and belief, Lanman, Cuellar, and Kropf receive between $20-40,000 per patient for Lumbar ADR procedures from private insurers and between $7-$30,000 per patient for Lumbar ADR procedures from CMS.

193.    Private insurers and CMS set specific guidelines for ADR surgeries.  By Cuellar, Lanman, and Kropf preparing falsified operative reports to circumvent the guidelines, and then submitting or causing Cedars-Sinai to submit a claim for reimbursement to private insurers and CMS, Cedars-Sinai, Cuellar, Lanman, and Kropf made or causes to be made a false statement material to a claim for payment in violation of FCA and CIFPA.

194.    Had private insurers and CMS known of the fraudulent operative reports, they would not have approved the experimental/investigational surgery because it was outside the guidelines and as a result not reimbursed Cedars-Sinai, Lanman, Cuellar, and Kropf for the surgery.

195.    _Sub-Scheme 2.2: Lumbar ADR Violations – Specific Examples_.

196.    _Patient AD_. Medical records for patient AD include: an August 27, 2019 Operative Report (attached hereto as **Exhibit 23**), History and Patient Information Sheet (attached hereto as **Exhibit 24**), Pre-Procedure Note and Attestation (attached hereto as **Exhibit 25**) and Post-Operative Note (attached hereto as **Exhibit 26**).

197.    The surgeon listed is Cuellar.

198.    The Pre-Procedure Note and Attestation records describe the surgery accurately.  For example, the August 27, 2019 preoperative procedure is listed as Lumbar Fusion Anterior Lumbar 5-sacral 1, Lumbar Total Disc Replacement Lumbar 3-4, 4-5. (See **Exhibit 25**).

199.    However, the operation performed states, "Anterior lumbar interbody fusion with Synthes ATV plate ant femoral ring allograft, L5-S1, anterior lumbar diskectomies, L3-4 and 4-5, use and interpretation of intraoperative fluoroscopy." (See **Exhibit 23**).

200.    The operative report describes only L5-S1 fusion and L3-4 and L4-5

lumbar diskectomies but was falsified to omit mentioning of the ADR at L3-4 and L4-5. *Id.*

201.   The post-operative x-ray clearly shows that Lumbar ADR surgery was performed at multiple (L3-4 and L4-5) levels. (Imaging Studies attached hereto as **Exhibit 27**).

202.   At the time of the procedure the patient AD was insured by Anthem Blue Cross PPO. (Anthem Blue Cross PPO Identification Attached hereto as **Exhibit 28**). As detailed above, Anthem Blue Cross approves Lumbar ADR procedures at <u>only one (single) level</u>.

203.   Cedars-Sinai, and Cuellar submitted a fraudulent claim using the August 27, 2019 falsified operative report that only mentions anterior lumbar diskectomies, L3-4 and 4-5 and fails to include the L3-4 and L4-5 artificial disks clearly shown in the imaging.

204.   This procedure was outside the private insurer guidelines and would not have been subject to reimbursement but for Cedars-Sinai, and Cuellar's submission of the fraudulent operative report.

205.   *<u>Patient TF</u>*.  Medical records for patient TF include: an August 27, 2019 Operative Report (attached hereto as **Exhibit 29**) and Progress Notes (attached hereto as **Exhibit 30**).

206.   Patient TF was brought to the operating room for a two-stage spinal procedure by Kropf.

207.   At the time of the procedure, the patient was a 77-year-old Medicare recipient with Medicare Supplemental insurance provided by Anthem BlueCross. (Medicare and Anthem Cards Attached hereto as **Exhibit 31**).

208.   The August 27, 2019 preoperative diagnosis was a lumbar disk degeneration at L3-4, L4-5 and L-5-S1, and lateral recess spinal stenosis at L4-5 and L5-S1 with radiculopathy.  The <u>procedure to be performed was described as 3-level ADR</u>. (*See generally* **Exhibit 29**).

209.   The operative report itself, however, was falsified to omit mention of the ADR at L5-S1 and L4-L5.  It states: "1. Left retroperitoneal approach anterior lumbar spine and exposure by vascular surgery. 2. Anterior discectomy L5-S1 with anterior interbody fusion with SynFix intradiscal mechanical fixation device. Fusion with fresh frozen allograft bone, Grafton putty, and bone morphogenetic protein mixture. 3. Additional level L4-L5 diskectomy and fusion with SynFix intradiscal fixation device. 4. Additional level anterior discectomy and <u>interbody placement of ProDisc lumbar.</u> 5. Fluoroscopy 2 hours. *Id*.

210.   The operative report only mentions insertion of a ProDisc Lumbar implant at L3-L4. *Id*.

211.   However, the post-operative x-ray clearly shows that Lumbar ADR surgery was performed at multiple levels. (Imaging Studies Attached hereto as **Exhibit 32**).

212.   Two days later, Kropf went back to the operating room and performed a Posterior instrumentation, NuVasive, L4-S1; Posterolateral fusion with fresh frozen allograft bone, grafton putty and BMP, L4-S1; Bilateral lumbar laminotomy, L4-5, L5-S1 with decompression of bilateral L4, L5 and S1 nerve roots. (August 29, 2019 Operative Report Attached hereto as **Exhibit 33**).

213.   Cedars-Sinai and Kropf submitted a fraudulent claim using the August 27, 2019 falsified operative report that only mentions the ProDisc Lumbar ADR at L3-L4 despite the imaging clearly showing otherwise.

214.   This procedure was outside the private insurer guidelines and would not have been subject to reimbursement but for Cedars-Sinai, and Kropf's submission of the fraudulent operative report.

215.   These are just some examples of Cedars-Sinai, Cuellar, Lanman, and Kropf's ADR scheme submitted to private insurers and CMS for reimbursement with falsified operative reports.

216.   *Private Insurer/Medicare Damages*. From 2014 to the present, Cedars,

Cuellar, Lanman, and Kropf submitted claims for reimbursement to private insurers and CMS totaling tens of millions of dollars for ADR surgeries that private insurers and CMS would not have paid but for Defendants materially false presentation of falsified operative reports.

217.    *Cedars-Sinai is Aware of the Falsified Operative Reports*.  Since at least 2015, Cedars-Sinai was aware that Cuellar, Lanman, and Kropf were performing cervical and lumbar ADR surgeries outside private insurer guidelines and submitting claims using falsified operative reports.

218.    In late January 2015 at Cedars-Sinai's 14th Annual Symposium on Current Concepts in Spinal Disorders at the Aria Hotel in Las Vegas, Relator discussed his concerns with Dr. Goldstein regarding Lanman, Cuellar, and Kropf falsifying of operative reports during ADR surgeries.  Dr. Goldstein's response was short, "We will look into it."  Relator never heard from Dr. Goldstein or Cedars-Sinai about this issue again.

219.    Through his investigation, Relator discovered Cedars-Sinai surgeons Mark Vrahas (Cedars-Sinai Chair of Orthopedic Surgery) Baron, Johnson, and Anand also expressed their concerns to Cedars-Sinai about Cuellar, Lanman, and Kropf repeated history of falsifying operative reports for ADR surgeries and submission for payment.

220.    Relator discovered Cedars-Sinai holds monthly department meetings.  At monthly department meetings for Orthopedic Surgery, Drs. Vrahas, Baron, Johnson, and Anand told Bryan Croft and Dr. Gewertz about Drs. Cuellar, Lanman, and Kropf ADR scheme in December 2018, February 2020 and as recent as July 2022, during these monthly meetings.

221.    Despite being aware of the scheme, Cedars-Sinai submitted claims for their own financial benefit.

//

//

## VI.     <u>CAUSES OF ACTION</u>

**<u>FIRST CAUSE OF ACTION</u>**
**On behalf of the United States**
**Federal False Claims Act**
**Presenting False Claims**
**31 U.S.C. § 3729(a)(1)(A)**
**(Against All Defendants)**

222.   Relator incorporates herein by reference and reallege the factual allegations stated in paragraphs 1–221 above.

223.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

224.   Defendants knowingly presented or caused to be presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by the Medicare program.

225.   Among other things, from 2009 to the present, Defendants Cedars-Sinai, Delamarter, Bae, and Rasouli, knowingly submitted false claims and/or caused the submission of false claims for Medicare business that was obtained by means of, and as a result of, submitting claims for concurrent surgeries without patient informed consent and inaccurate records.

226.   Among other things, from 2014 to the present, Defendants Cedars-Sinai, Lanman, Cuellar, and Kropf, knowingly submitted false claims and/or caused the submission of false claims for Medicare business that was obtained by means of, and as a result of, submitting claims for ADR surgeries with the use of falsified operative reports.

227.   Defendants knowingly made, used, and caused to be made and used false certifications that their claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

228.   The conduct of Defendants violated 31 U.S.C. § 3720(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**SECOND CAUSE OF ACTION**
**On behalf of the United States**
**Federal False Claims Act**
**Making or Using False Records or Statements**
**Material to Payment or Approval of False Claims**
**31 U.S.C. § 3729(a)(1)(B)**
**(Against All Defendants)**

229.   Relator incorporates herein by reference and reallege the factual allegations stated in paragraphs 1–221 above.

230.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

231.   Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by the Medicare programs.

232.   Among other things, from 2009 to the present, Defendants Cedars-Sinai, Delamarter, Bae, and Rasouli, knowingly submitted false claims and/or caused the submission of false claims for Medicare business that was obtained by means of, and as a result of, submitting claims for concurrent surgery without patient informed consent and inaccurate records.

233.   Among other things, from 2014 to the present, Defendants Cedars-Sinai, Lanman, Cuellar, and Kropf, knowingly submitted false claims and/or caused the submission of false claims for Medicare business that was obtained by means of, and as a result of, submitting claims for ADR surgeries with the use of falsified operative reports.

234.   Defendants knowingly made, used, and caused to be made and used false

1  certifications that their claims, and all documents and data upon which those claims
2  were based, were accurate, and were supplied in full compliance with all applicable
3  statutes and regulations.

4      235.  The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was
5  a substantial factor in causing the United States to sustain damages in an amount
6  according to proof.

**THIRD CAUSE OF ACTION**
**On behalf of the United States**
**Federal False Claims Act**
**Conspiracy to Violate False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**
**(Against All Defendants)**

12     236.  Relator incorporates herein by reference and reallege the factual
13  allegations stated in paragraphs 1–221 above.

14     237.  Defendants conspired with each other to commit the violations alleged in
15  this Complaint, including causes of action one, two and four.

16     238.  Defendants performed acts, including blocking operating rooms,
17  falsifying medical records and submitting fraudulent documentation to affect the
18  object of the conspiracy.

19     239.  The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(C) and was
20  a substantial factor in causing the United States to sustain damages in the amount
21  according to proof.

**FOURTH CAUSE OF ACTION**
**On behalf of the United States**
**Federal False Claims Act**
**Retention of Proceeds to Which Not Entitled**
**31 U.S.C. 3729(a)(1)(G)**
**(Against All Defendants)**

27     240.  Relator incorporates herein by reference and reallege the factual
28  allegations stated in paragraphs 1–221 above.

241.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States with respect to the Medicare programs.

242.   Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by the Medicare programs.

243.   Among other things, from 2009 to the present, Defendants Cedars-Sinai, Delamarter, Bae, and Rasouli, knowingly submitted false claims and/or caused the submission of false claims for Medicare business that was obtained by means of, and as a result of, submitting claims for concurrent surgery without patient informed consent and inaccurate records.

244.   Among other things, from 2014 to the present, Defendants Cedars-Sinai, Lanman, Cuellar, and Kropf, knowingly submitted false claims and/or caused the submission of false claims for Medicare business that was obtained by means of, and as a result of, submitting claims for ADR surgeries with the use of falsified operative reports.

245.   Defendants knowingly made, used, and caused to be made and used false certifications that their claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

246.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

//

//

**FIFTH CAUSE OF ACTION**
**On behalf of the State of California**
**California Insurance Frauds Prevention Act**
**Cal. Ins. Code §1871.7 *et seq.* and Cal. Pen. Code § 550 *et seq*.**
**(Against Defendants Cedars-Sinai, Lanman, Cuellar, and Kropf)**

247.    Relator incorporates herein by reference and reallege the factual allegations stated in paragraphs 1–221 above.

248.    Subsection (b) of Cal. Ins. Code § 1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code §§ 549 or 550.

249.    Section 550 of the Penal Code prohibits the following activities, among others:

(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

*****

(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains

any false or misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

250. From 2014 to the present, Defendants Cedars-Sinai, Lanman, Cuellar, and Kropf knowingly presented, or caused to be presented, false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, in order to obtain payment from insurers, in violation of Penal Code § 550(a) and Cal. Ins. Code § 1871.7(b). The claims were false or fraudulent because, among other things:

- Defendants knowingly sought, and falsely represented that it was entitled to reimbursement in excess of amounts it was owed;
- Defendants knowingly sought and falsely represented that it was entitled to reimbursement for services not actually performed;
- Defendants knowingly sought, and falsely represented that it was entitled to, reimbursement for treatment that did not meet the required conditions set out by insurers for reimbursement;
- Defendants knowingly sought, and falsely represented that he was entitled to, reimbursement for treatments for which he had not provided.

251. Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

252. This conduct was a substantial factor in causing damages as detailed herein.

## VII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs the United States of America, and State of California by and through Relator, prays for relief against all Defendants as follows:

Pursuant to the Federal False Claims Act as alleged in the First, Second, Third, and Fourth Causes of Action for damages as provided by 31 U.S.C. § 3729(a)(1)(A)-

(C) & (G), respectively, in the amount of:

    i.    treble the amount of damages sustained by the United States;

    ii.    civil penalties of up to the maximum allowable amount for each false claim and/or false statement;

    iii.    recovery of costs, attorney's fees, and expenses;

    iv.    pre- and post-judgment interest; and

    v.    such other and further relief as the court deems just and proper.

Pursuant to the California Insurance Frauds Prevention Act as alleged in the Fifth Cause of Action:

    i.    civil penalties of up to the maximum allowable amount for each false claim and/or false statement

    ii.    an assessment of three-times the amount of each claim for compensation made by Defendants;

    iii.    recovery of costs, attorney's fees, and expenses;

    iv.    pre and post-judgment interest; and

    v.    such other and further relief as the court deems just and proper;

Further, as to the First to Fifth Causes of Action, Relator on its own behalf, requests that it receive:

    i.    such maximum amount as permitted by law of the proceeds of this action or settlement of this action awarded to *qui tam* plaintiff; that its percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

    ii.    recovery of costs, attorney's fees, and expenses;

    iii.    pre and post-judgment interest; and

    iv.    such other and further relief as the court deems just and proper.

Dated: August 30, 2024        **COTCHETT, PITRE & McCARTHY LLP**

By:   *s/Carlos Urzua*
        GRACE Y. PARK
        CARLOS URZUA
        *Attorneys for Relator*

1

## VIII. <u>JURY DEMAND</u>

2          Plaintiff demands a jury trial on all issues so triable.

3

4     Dated: August 30, 2024          **COTCHETT, PITRE & McCARTHY LLP**

5                                     By: <u>  s/Carlos Urzua  </u>
6                                         GRACE Y. PARK
                                          CARLOS URZUA
7                                         *Attorneys for Relator*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **<u>PROOF OF SERVICE</u>**

2

3

I am employed in the County of Los Angeles.  I am over the age of 18 years and not a party to this action.  My business address is the Law Offices of Cotchett, Pitre & McCarthy, LLP, 2716 Ocean Park Blvd, Santa Monica, California 90405.

4

5

On this day, August 30, 2024, I served copies of the following document(s) in the manner described below:

6

1.    *Qui Tam Plaintiff's First Amended Complaint*

7

8

√_ BY E-SERVICE VIA CM/ECF NOTIFICATION: I electronically transmitted the document(s) listed above to CM/ECF for the U.S. District Court for the Central District of California, an electronic filing service provided at https://ecf.cacd.uscourts.gov. To my knowledge, the transmission was reported as complete and without error.

9

10

11

√_ BY E-MAIL: My e-mail address is amason@cpmlegal.com and service of this document(s) occurred on the date shown below. This document is being served electronically and the transmission was reported as complete and without error.

12

13

14

√_ BY MAIL:  I am readily familiar with this firm's practice for collection and processing of correspondence for mailing.  Following that practice, I placed a true copy of the aforementioned document(s) in a sealed envelope, addressed to each addressee, respectively, as specified below.  The envelope was placed in the mail at my business address, with postage thereon fully prepaid, for deposit with the United States Postal Service on that same day in the ordinary course of business.

15

16

17

18

## **[SEE ATTACHED SERVICE LIST]**

19

20

I certify that the aforementioned documents were accurately transmitted to the specified email addresses on the date mentioned above. I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

21

22

*s/Ashley Mason*

23

ASHLEY MASON

24

25

26

27

28

1

## **SERVICE LIST**

2

| Party | Counsel |
|---|---|
| **SERVED VIA CM/ECF NOTIFICATION**<br>Cedars-Sinai Medical Center, Theodore Goldstein, M.D., William Brien, M.D.<br>Rick Delamarter, M.D. | Jennifer Weaver<br>**Holland & Knight**<br>Nashville City Center<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>Phone: (615) 850-8116<br>jennifer.weaver@hklaw.com<br><br>Eddie Jauregui<br>**Holland & Knight**<br>400 South Hope Street, 8th Floor \| Los Angeles, California 90071<br>Phone: (213) 896-2455<br>eddie.jauregui@hklaw.com |
| **SERVED VIA CM/ECF NOTIFICATION**<br>Alexandre Rasouli, M.D., Hyun Bae, M.D., Todd H. Lanman, M.D., Jason Cuellar, M.D. | Brian Dunphy<br>**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**<br>One Financial Center<br>Boston, MA 02111<br>Phone: (617) 348-1810<br>BDunphy@mintz.com<br><br>Geoffrey A. Friedman<br>**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104<br>Phone: (415) 432-6000<br>Fax: (415) 432-6001<br>gafriedman@mintz.com<br><br>**Arameh Zargham O'Boyle**<br>Mintz Levin Cohn Ferris Glovsky and Popeo P.C.<br>2049 Century Park East Suite 300<br>Los Angeles, CA 90067<br>310-226-7846<br>Fax: 310-586-3202<br>Email: azoboyle@mintz.com |
| **SERVED VIA E-MAIL**<br>United States of America Department of Justice, Civil Frauds Division | Frank D. Kortum<br>**US Attorney's Office**<br>300 N. Los Angeles St., No. 7516<br>Los Angeles, CA 90012<br>frank.kortum@usdoj.gov |
| **SERVED VIA E-MAIL**<br>California Department of Insurance Fraud Liason Bureau | Christopher Cimiluca<br>Nathaniel Spencer-Mork<br>**California Department of Insurance**<br>1901 Harrison St. Fl 6th |

| | Oakland, CA 94612<br>christopher.cimiluca@insurance.ca.gov<br>nathaniel.spencer-mork@insurance.ca.gov |
|---|---|
| **SERVED VIA FIRST-CLASS MAIL**<br>Michael Kropf, M.D. | Agent Authorized to Accept:<br>**1505 CT CORPORATION SYSTEM**<br>330 N. Brand Blvd, Suite 700<br>Glendale, CA 91203<br><br>Cedars-Sinai Spine Center<br>444 S San Vicente Blvd<br>Mark Goodson Building, Suites 800 and Suite 901<br>Los Angeles, CA 90048<br><br>PO BOX 5978<br>FULLERTON, CA 92838-0978<br>Phone: 714-992-5292<br>Fax:714-992-1956 |